LOTTINGER, Judge.
This is a workmen’s compensation proceeding wherein the plaintiff seeks to recover from two separate employers and insurers compensation benefits at the rate of $30 per week for four hundred weeks. In his petition, he alleges that he was injured on March 29, 1956 while employed by the Fluor Corporation, Ltd., the latter being insured by the Continental Casualty Company. He sets forth that this injury consisted of a severe back sprain together with a possible ruptured intervertebral disc and other back injuries. The petition then goes on to allege that while he was recovering, he was employed by one Hunter Kirkland, a subcontractor of Robert Van Zandt, who was insured' by the Old Republic Insurance Company, from June 25, 1956, this injury consisting of a compression fracture of the seventh and eighth dorsal vertebrae.
Prior to trial on the merits, the plaintiff compromised his suit against the Fluor Corporation and its insurer, Continental Casualty Company, and he now prosecutes this appeal from a judgment of the Lower Court dismissing his suit as to the other defendants.
After plaintiff’s injury while employed by the Fluor Corporation he was advised by his treating physician that he should try to work. He approached Hunter Kirkland, a deacon in the plaintiff’s church, and requested of him that he, plaintiff, be permitted to go out on Kirkland’s job to see if he could work. Kirkland told him that he could not use him, as he had a full crew and if the plaintiff were able to work he might give him a few days. The plaintiff stated that he was not seeking employment but only wanted to go out into the woods to prove to the doctor and to the other company, the Fluor Corporation, that he was not able to work. While there is a serious doubt in our minds as to whether the plaintiff was ever employed by Robert Van Zandt we prefer to rest our decision, as did the trial Judge, on the failure of the plaintiff to prove the alleged accident on June 25, 1956.
The plaintiff testified that he went to work on the morning of June 25, 1956, and was engaged in chopping limbs from pulpwood when he felt a “ * * * stinging in my back and after about an hour, I had a serious pain in my back. Pain froze me up where I couldn’t work no more.” He stated further that he returned to town with Hunter Kirkland and that he told him and Curtis Brown that he had a pain in his back and he had to leave work.
*873 In the deposition taken of plaintiff he stated as follows:
“Q. How long was it before Hunter came out? A. It couldn’t have been over thirty or forty minutes before he came.
“Q. What was the first thing you told him? A. I told him, 'Hunter, I can’t make it.’
“Q. Well, what did Hunter tell you? A. He said, 'Well, the best thing is let me take you in.’
“Q. Did you leave immediately? A. Yes, sir, I left immediately.
“Q. He didn’t' load up his truck with wood? A. I don’t think he did.
“Q. He brought you in on an empty truck? A. I think he did.”
Curtis Brown, who is a ■ nephew and member of the same church as the plaintiff, testified as follows:
“Q. Was he trimming all right? A. Yes, he was trimming all right, cutting limbs off.
“Q. Did he seem to have any trouble cutting the limbs off ? A. Well, I didn’t pay much attention. I was loading.
“Q. Do you know whether or not he got hurt anytime while he was out there at work? A. Not as I know.
“Q. You don’t know? A. No.
* * * * * *
“Q. On the days that he was working did he tell you at anytime that he got hurt? A. During the time he was working?
“Q. Yes. A. No, he didn’t tell me.
“Q. Did he complain at any time to you?
* * * * * *
“Q. Did Lonnie lies make any statements as to any pain or suffering that he was having on the day that he was out working with you for Hunter Kirkland? A. That he got hurt out there?
"Q. No, that he complained? A. No, sir.
“Q. He did not. A. (Witness shaking head in a negative manner on both questions).”
It is significant that this witness was called by the plaintiff and gave the above quoted testimony on direct examination by the plaintiff’s attorney. When questioned by the Court, Brown gave the following testimony: !
“The Court: Did he give anybody the reason why he was leaving other than Kirkland?
“The Witness: Well, he didn’t tell me. I don’t know what he told Hunter Kirkland. He didn’t tell me nothing he just went on in.
“The Court: And he worked right-up until the time he left?
“The Witness: Yes, Sir.
“The Court: You saw him with your own eyes?
“The Witness: I seen him trimming.
“The Court: While you were loading the last load?
“The Witness: Yes, Sir.”
Elvin Berry, also a fellow churchman of the plaintiff and called on the latter’s behalf, gave the following testimony on direct examination:
“Q. When did Lonnie leave? A. He left when Hunter came back to reload the truck. He left with him and came back home.
“Q. Do you know why he left? A. No, sir, I don’t.
***** *
“Q. Did Lonnie lies make any statements to you about the reason for him leaving work? A. No-, Sir.”
*874 Under cross examination, this witness testified as follows:
“Q. You were in the woods all the time Lonnie lies was out there weren’t you? A. Yes, I was.
“Q. He didn’t have any accident while you were there did he ? A. Not as I know.
“Q. He didn’t say anything to' you about having an accident did he? A. No, Sir, he didn’t.”
Hunter Kirkland, testifying on behalf of the defendants, testified that he had known the plaintiff some time and that he was a minister in the church in which he, Kirkland, was a deacon. He gave the following testimony?
“Q. After the truck was loaded what happened? A. Me and him got in the truck and he said, ‘Well, I’m going in on this load.’ And so me and him got in the truck and we came on to the house talking to one another.
“Q. All right. Did anything unusual happen to Lonnie while the truck was being loaded the second time it was while you were in the woods? A. No, sir.-
“Q. Did he say anything to you about being hurt while you were gone to the tracks? A. No. Not a word.
“Q. Now, what did you talk about on your way home? A. Well, we was just going on talking as usual. We didn’t have nothing especially to talk about as I can remember.
“Q. Now, did he say anything to you about having been hurt on the job? A. Well, he told me before he went out there he was already hurt.
“Q. I’m not talking about that job. While he was out there in the woods on your job did he — do- you know if he got hurt or not of your own knowledge? A. Well, he didn’t show that he got hurt.
“Q. Did you see him have an accident? A. No, Sir. I didn’t see him have an accident.
“Q. All right. Now, on the way home did he say anything to you about having been hurt on the job? A. No, sir, he didn’t say anything about that.
“Q. Well, when you got home what did he do? A. He jttst say, ‘Well, that’ll do it babe’, and got out.”
It would merely lengthen this opinion to- show the many inconsistencies in plaintiff’s testimony. The trial judge saw and heard the witnesses and failed to believe the uncorroborated testimony of the plaintiff with respect to the alleged injury. The record discloses no manifest error in his findings, and they shall, therefore, remain undisturbed.
For the reasons assigned, the judgment appealed from is affirmed.
Judgment affirmed.